# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |  |
|---|---|---|---|
| | : | | |
| MOSER PILON NELSON | : | | |
| ARCHITECTS, LLC, ET AL., | : | | |
| Plaintiffs, | : | | NO. 05CV422 (MRK) |
| | : | | |
| v. | : | | |
| | : | | |
| HNTB CORPORATION, ET AL., | : | | |
| Defendants. | : | | |

## MEMORANDUM OF DECISION

In this action, Plaintiffs – losers of a publicly-bid competition to design a new parking garage for Central Connecticut State University (CCSU) – claim that Defendants – winners of that competition – modified their original design for the garage and constructed a garage along the lines of Plaintiffs' losing design, in violation of the Copyright Act, the Lanham Act, the Connecticut Unfair Trade Practices Act ("CUTPA"), and state common law prohibiting unjust enrichment and conversion.

Defendant HNTB Corporation ("HNTB") has filed three motions for summary judgment [docs. ## 50, 52, 66], each of which has been adopted by co-Defendant Downes Construction Co. ("Downes") [docs. ## 65, 75].  In these motions, Defendants argue: (1) that Plaintiffs' claims of conversion, unjust enrichment, and violation of CUTPA and the Lanham Act are preempted by the Copyright Act; (2) that Plaintiffs' Copyright Act claim fails because the copyright registration relied upon is invalid; and (3) that Plaintiffs other than Kenneth Pilon should be dismissed for lack of standing because they are not owners of the claimed copyright.

For the reasons that follow, the Court DENIES Defendants' Motion for Summary Judgment

of Invalidity [doc. # 52]; GRANTS IN PART Defendants' Motion for Summary Judgment of Non-Ownership [doc. # 66], and GRANTS IN PART Defendants' Motion for Summary Judgment of Preemption [doc. # 50]. Accordingly, only Kenneth Pilon and James Brockman may pursue Count I for copyright infringement, all Plaintiffs may pursue Count V for violation of CUTPA, and summary judgment is granted against all Plaintiffs on Counts II, III, and IV under the Lanham Act, state law of unjust enrichment, and state law of conversion, respectively.

## I.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so. *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," but must rather "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court must draw all ambiguities and inferences in favor of the non-moving party. *See Andersen*, 477 U.S. at 255. However, to defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be

2

granted." *Andersen*, 477 U.S. at 249-50.

## II.

The following forms the factual background to Plaintiffs' claims. As required on motion for summary judgment, the Court recites the facts in the light most favorable to the non-moving party – here Plaintiffs.

In November 2001, a team composed of Plaintiffs Macchi Engineers ("Macchi"), Moser Pilon Nelson Architects ("Moser Pilon" or "MPN"), and general contractor O&G Industries of Torrington, Connecticut, was shortlisted as a finalist in a competition to design and ultimately to construct a parking garage for Central Connecticut State University (the "CCSU garage"). Macchi was the design consultant to O&G, with responsibility for providing "the requisite engineering design," Plaintiffs' Local Rule 56(a)(2) Statement Supplement [doc. # 83] at 2, ¶ 35, while Moser Pilon, which had agreed to work as the architectural sub-consultant to Macchi, was tasked with providing "the requisite architectural design input," *id.*

The collaborative effort of Defendants Downes and HNTB was also shortlisted as a finalist in the CCSU garage competition. Although Plaintiffs' and Defendants' proposals shared the same basic rectangular design with a stair-tower at each corner of the garage, the layout and appearance of each team's proposed stair-tower differed substantially. *See* Plaintiffs' Exs. 3, 17, attached to Affidavit of Kenneth F. Pilon [doc. # 74]. The proposed costs of design and construction were also different: Defendants' proposal estimated a total cost of $16,969,810, or $16,160 per space for 1050 parking spaces. Plaintiffs' Exs. 1, 2 [docs. ## 74.2, 74.3]; Defendants' Ex. 9, attached to Statement of Material Facts re Motion for Summary Judgment of Invalidity [doc. # 54] at 3. Plaintiffs' proposal estimated a lower total cost of $16,452,000, but a higher per space cost of $16,651 for either 988 or

997 spaces (the record is unclear as to the number of spaces provided for).  Defendants' Ex. 9 [doc. # 54.11] at 3 .

Plaintiffs' claim that the selection process was biased in favor of Downes.  In support of this theory they point to the fact that Kenneth Russo of Downes dined socially every month with both the Deputy Commissioner and the Bureau Chief of the Connecticut Department of Public Works ("DPW") – the state agency that was running the competition.  Deposition of Kenneth Russo, Plaintiffs' Ex. 5 [doc. # 74.6] at 29-30 [hereinafter "Russo Dep."].  In addition, on November 20, 2001, a project manager for DPW unofficially told Kenneth Russo of Downes that his team's construction price was ranked second, and that Downes should "get rid of the architect," because their design submission was "not good."  Plaintiffs' Ex. 1 [doc. # 74.2]; Russo Dep. at 70-73.

On November 21, 2001, the President of CCSU sent an email to CCSU's representative on the selection panel for the competition stating that he did not like the Downes proposal, that in his view it did not comply with the design guidelines for the CCSU garage, and that he would convey his opinion to the Deputy Commissioner of the Department of Public Works, who was managing the competition.  Plaintiffs' Ex. 2 [doc. # 74.3].  A few hours after the President's email, the three finalist teams were interviewed by a selection panel comprised of representatives of the DPW and CCSU.  That same day, each panelist completed a score sheet for each proposal.  *See* Defendants' Ex. 2 [doc. # 54.3].  In evaluating the proposed designs, the panelists assigned the following weights to the deisgnated criteria: building aesthetics – 15%; compliance with the "program for design" – 15%; landscaping – 10%;  total project cost – 20%; and construction schedule – 25%.  Plaintiffs' Local Rule 56(a)(2) Statement [doc. # 71] ¶¶ 26-28.

Defendants' design had a lower per-parking-space cost and a better schedule than Plaintiffs'

proposal.  Plaintiffs' Local Rule 56(a)(2) Statement [doc. # 71] ¶ 30.  Accordingly, Defendants' design scored more highly on the criteria used by the selection panelists.  Defendants' Ex. 2 [doc. # 54.3].  Plaintiffs' proposal scored more highly than Defendants' on design aesthetics but fared less well on compliance with the "program for design."  Defendants' Ex. 2 [doc. # 54.3].  In line with these scores, the selection panel unanimously ranked Defendants' proposal first out of the three finalists' submissions; Plaintiffs' proposal ranked second.  Accordingly, by letter dated November 29, 2001, Defendants were awarded the contract for the CCSU garage.  Plaintiffs' Rule 56(a)(2) Statement [doc. # 71] at 7, ¶ 6; Russo Dep. [doc. # 74.6] at 108.  The final contract was not signed until May 2002.  Amended Complaint [doc. # 45] ¶ 13.

In December 2001, after the award of the CCSU garage contract to Defendants, but before execution of the final contract, CCSU staff showed Defendant Downes renderings of the CCSU garage that Downes understood to be authored by Moser Pilon.  CCSU staff asked Downes to change its proposed design to adopt some of the features of the design shown on the Moser Pilon renderings. Russo Dep. [doc. # 74.6] at 119-120, 154; Plaintiffs' Rule 56(a)(2) Statement [doc. # 71] at 7, 9 ¶¶ 6, 11.  The record further reflects that Defendant HNTB was aware of CCSU's preference for the aesthetic aspects of the Moser Pilon proposal; *see* Plaintiffs' Ex. 4 [doc. # 74.5], and CCSU's representative on the selection panel testified that CCSU would have been unwilling to go forward with the Project unless Downes made the requested design changes, *see* Deposition of Daniel Moran, Plaintiffs' Ex. 8 [doc. # 74.9] at 137-38.

Defendants agreed to revise their design but observed that the revised design of the stair-towers would increase the cost by $395,500.  Plaintiffs' Ex. 13 [doc. # 74.14].  In order to complete the revised design for the Project at the price that Defendants had quoted in their original submission,

Defendants requested and received permission to substitute thin brick tile finish in lieu of field laid brick on all spandrel panels. *Id.* Defendants submitted renderings of their revised design in April 2002. *See* Plaintiffs' Ex. 3 [doc. # 74.4]. The layout and appearance of the stair-towers in Defendants' re-design is similar to the design of the stair-towers in Plaintiffs' losing submission. *See* Plaintiffs' Exs. 3, 17 [docs. ## 74.4, 74.18].

In February 2003, as final construction of the CCSU garage was underway, Plaintiffs learned for the first time that Defendants had altered their original proposal and adopted a final design for the stair-towers resembling that of Plaintiffs' losing bid. Thereafter, in November 2003, Plaintiffs applied for copyright protection of their design for the CCSU garage.

Two features of Plaintiffs' application are critical to the legal analysis that follows. First, although Plaintiffs submitted technical drawings in support of their copyright application, they did not register the drawings themselves for protection as "pictorial, graphic, and sculptural works" under 17 U.S.C. 102(a)(2). *See* Certificate of Registration, Defendants' Ex. 3 [doc. # 54.4]; Plaintiffs' Rule 56(a)(2) Statement [doc. # 71] ¶¶ 13, 16, 23-25. Rather, Plaintiffs registered the design of the CCSU garage as an architectural work under a newly-minted provision of the Copyright Act, 17 U.S.C. 102(a)(8). That provision had significantly altered the traditional copyright framework – under which only architectural drawings were protected, and not the finished work – by extending protection to the shape of the three-dimensional structure and thus giving the owner of an architectural work copyright the exclusive right to build the structure (thereby bringing the United States into compliance with its obligations under the Berne Convention for the Protection of Literary and Artistic Works). *See e.g.*, Robert A. Gorman, *Copyright Law* ch. 2, at 47-48 (Federal Judicial Center 2d ed. 2006). Thus, the drawings themselves are not protected and this lawsuit is

not about the copying of the drawings themselves; rather, the claim is one for infringement of the design of the CCSU garage as an architectural work.

Second, the application names only Kenneth Pilon as an author of the registered work. *See* Certificate of Registration, Defendants' Ex. 3 [doc. # 54.4].  Although the application originally named as authors both James Brockman and Kenneth Pilon, Mr. Brockman's name was stricken by Mr. Pilon from the author field of the application after an official at the Copyright Office advised him that it was customary for the copyright registration of an architectural work to appear in the architect's name alone.  Plaintiffs' Rule 56(a)(2) Statement [doc. # 71] ¶¶ 15, 17.  Thus, although Plaintiffs assert that they had always understood themselves to be joint authors of the CCSU Project, and although Mr. Pilon claims that he understood the copyright would be jointly-owned, the copyright in the Macchi/MPN/O&G design for the CCSU Project was in fact registered in Mr. Pilon's name alone.

### III.

As rehearsed above, Defendants seek summary judgment on three separate grounds: (1) that the copyright is invalid; (2) that only one of the named Plaintiffs owns the copyright; and (3) that Plaintiffs' additional claims are all preempted by the Copyright Act.  Because a determination that the copyright is invalid affects the scope of analysis required on Defendants' other claims, the Court begins with the question of validity.

A.   Validity of the Copyright

To succeed on their claim of copyright infringement, Plaintiffs must demonstrate the following: (1) ownership of a valid copyright; and (2) unauthorized copying of the copyrighted work. *See, e.g.*, *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003).  In their Motion for

Summary Judgment of Invalidity [doc. # 52], Defendants argue that Count I fails because Plaintiffs'

copyright registration is invalid.[1]  Plaintiffs have presented a certificate of copyright registration, and

that constitutes *prima facie* evidence of a valid copyright under 17 U.S.C. § 410(c).  However, the

presumption of validity created by a certificate of registration may be rebutted through presentation

of evidence that the allegedly copyrighted work is not copyrightable.  *See, e.g.*, *Fonar Corp. v.

Magnetic Resonance Plus, Inc.*, 105 F.3d 99, 104 (2d. Cir. 1997).  Here, Defendants argue that

Plaintiffs' design for the CCSU garage is not a copyrightable item, on the grounds that the proposed

CCSU garage is not a "building" within the meaning of the architectural works provision of the

Copyright Act.

> In relevant part, the Copyright Act provides as follows:

> > An "architectural work" is the design of a building as embodied in any
> > tangible medium of expression, including a building, architectural plans, or
> > drawings. The work includes the overall form as well as the arrangement and
> > composition of spaces and elements in the design, but does not include
> > individual standard features.

17 U.S.C. § 101.  Because the Copyright Act does not define the key term "building," the Court must

begin its interpretive task by consulting the term's ordinary meaning.  *See Asgrow Seed Co. v.

Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them

their ordinary meaning."); *Garcia v. Teitler*, 443 F.3d 202, 207 (2d Cir. 2006) ("It is a basic rule of

statutory construction that a court begin with the plain and ordinary meaning of statutory terms.")

(internal quotation marks omitted).

> The Eighth Edition of Black's Law Dictionary defines a building as "[a] structure with walls

---

[1] Defendants at one pointed intimated that they would also challenge Plaintiffs' claim on the
unauthorized copying prong, but no such challenge has been advanced in the extensive summary
judgment filings.

and a roof, esp. a permanent structure." Black's Law Dictionary (8th ed. 2004). Similarly, the Second Edition of Webster's Unabridged Dictionary defines building as "a relatively permanent enclosed construction over a plot of land, having a roof and usually windows and often more than one level, used for any of a wide variety of activities, as living, entertaining, or manufacturing." Webster's Unabridged Dictionary 274 (2d ed. 2001). Under either of these definitions, as well as in common parlance, the parking garage designed by Plaintiffs qualifies as a "building." It is a permanent structure with a roof, and it encloses a space that is designed for a wide variety of human activities, including storage and shelter. Although part of the structure lacks complete walls and windows, each corner of the garage features an elevator-stair-tower with walls and windows. Furthermore, as Plaintiffs point out and Defendants do not deny, Plaintiffs' design for the CCSU garage is complex and includes interior and exterior signage, plumbing and fire protection, electrical systems, temperature controls, interior and exterior lighting, telephone communications, fire alarms, and enclosed and heated public lobbies designed to accommodate food vending machines. Memorandum in Opposition to Motion for Summary Judgment of Invalidity [doc. # 73] at 6-7.

Although Plaintiffs' design for a parking garage would appear to be a building in the ordinary sense of the word, Defendants insist that it is not a building within the meaning of the Copyright Act because it was not "designed specifically for use by humans as a place to socialize, engage in social activities, work, relax, or otherwise linger for a period of time." Reply to Objection to Motion for Summary Judgment of Invalidity [doc. # 78] at 4. Although their restrictive view of the meaning of "building" is not dictated by (or even in conformity with) the ordinary meaning of that term, Defendants nevertheless assert that their view of the class of structures protected by the Copyright Act is required by a Copyright Office regulation interpreting the architectural works provision of the

Copyright Act.  Plaintiffs do not challenge the validity of the Copyright Office regulation in question, but rather assert that their design for a parking garage at CCSU is a building under both the ordinary meaning of the term *and* the Copyright Office's definition.  The Court agrees that the Copyright Office's regulation does not define the term building so as to exclude Plaintiffs' design for the CCSU garage from the protection of the Act.[2]

The Copyright Office defines the term "building" as follows: "humanly habitable structures that are intended to be both permanent and stationary, such as houses and office buildings, and other permanent and stationary structures designed for human occupancy, including but not limited to churches, museums, gazebos, and garden pavilions." 37 C.F.R. § 202.11(b)(2). It further states that "[s]tructures other than buildings, such as bridges, cloverleafs, dams, walkways, tents, recreational vehicles, mobile homes, and boats," "cannot be registered."  37 C.F.R. § 202.11(d)(1).  Thus, the regulation divides structures into three broad categories: (1) structures that are "humanly *habitable*[,] . . . permanent and stationary, such as houses and office buildings," 37 C.F.R. § 202.11(b)(2) (emphasis added); (2) structures that are "permanent and stationary structures designed for human *occupancy*, including but not limited to churches, museums, gazebos, and garden pavilions," *id.* (emphasis added); and (3) structures that are not buildings at all, "such as bridges, cloverleafs, dams, walkways, tents, recreational vehicles, mobile homes, and boats," *id.*

Although Defendants may be correct that Plaintiffs' design for the CCSU garage is not

---

[2] Since neither party has challenged the validity of the Copyright Office's interpretive regulation and since, in any event, the Court does not discern any conflict between the statutory interpretation of the term building and that of the Copyright Office, the Court is not presented with, and does not decide, the delicate matter of what deference is due to the agency's interpretation of the statute.  *Cf. United States v. Mead Corp.*, 533 U.S. 218 (2001) (revisiting "the limits of *Chevron* deference owed to administrative practice in applying a statute").

"humanly habitable" in the same manner as a house or an office building, the Court agrees with Plaintiffs that it is surely a permanent and stationary structure as much designed for human occupancy as a gazebo or a garden pavilion.  It is used by visitors to the university on a daily basis, who store their cars in it, obtain food at the vending machines, and enjoy the shelter it provides from the elements, as well as by maintenance staff who clean it and store in it their equipment.  Defendants demur, asserting that "occupancy" in this context means "use by humans as a place to socialize, engage in social activities, work, relax, or otherwise linger for a period of time." Reply to Objection to Motion for Summary Judgment of Invalidity [doc. # 78] at 4.  In addition to the strain that this theory places on the ordinary meaning of the terms "building" and "occupancy," the Court notes that Defendants' attempt to restrict the class of protected structures on the basis of the average duration of human occupancy leads to serious line-drawing problems.  For example, on Defendants' theory, structures such as stand-alone garages that are built for private homeowners to store their cars would not benefit from the protection afforded the main home because such garages are not intended to be occupied by human beings for long periods of time for purpose of social activities  or relaxation.  Yet Defendant could not suggest, and this Court could not conceive, any principle upon which Congress would have wished to protect an architect's design of a home but not of an adjacent garage that was designed as an integral part of the homeowner's property.

Defendants also argue that the proposed CCSU garage is analogous to certain of the structures expressly excluded from the definition of a building by the Copyright Office's regulation – namely bridges, cloverleafs, dams, and walkways – and for that reason should be excluded from protection.  Defendants' analogy is unconvincing.  The CCSU garage may be distinguished from bridges, dams, walkways, and cloverleafs on any number of grounds.  For example: the CCSU

garage provides enclosed, lighted, and even heated shelter – the excluded structures typically do not; the purpose of bridges, cloverleafs, and walkways is to transport people and/or their vehicles from one point to another, rather than to provide shelter or storage; moreover, the form of a bridge, cloverleaf, dam, or walkway, unlike that of the design for the CCSU garage, is dictated primarily by engineering, not aesthetic, considerations.  Most significantly in the Court's view, the CCSU garage is a building within the ordinary meaning of the term; bridges, cloverleafs, dams, and walkways self-evidently are not.

Finally, the Court notes that its understanding of the statutory term and of the Copyright Office's definition of that term is consistent with the legislative history of the architectural works provision.  *Cf.  Cashman v. Dolce Intern./Hartford, Inc.*, 225 F. R. D. 73, 88 (D. Conn. 2004) ("When authoritative legislative history is available, courts may in appropriate circumstances cautiously look to that history to confirm an interpretation that is otherwise grounded in the text and structure of the act itself.").  The architectural works provision was enacted through the Architectural Works Copyright Protection Act of 1990, the House Report on which states the following: "[T]he term [building] encompasses habitable structures such as houses and office buildings.  It also covers structures *that are used, but not inhabited*, by human beings, such as churches, pergolas, gazebos, and garden pavilions." H.R. Rep. 101-735 (emphasis added).  The CCSU parking garage is surely "used . . . by human beings," and is as much of a building as a pergola, which is nothing more than a brief span of decorative awning to be passed under during a walk around a garden.  It is also noteworthy that Congress initially intended to extend protection to any "building *or other three dimensional structure*." *Id.* (emphasis added).  The second category of protected structures was deleted because that "the phrase could also be interpreted as covering interstate highway bridges,

12

cloverleafs, canals, dams and pedestrian walkways . . . some of which form important elements of this nation's transportation system." *Id.* Interpreting the term "building" to cover Plaintiffs' CCSU garage, which is not an element of the national transportation system, is consistent with Congress' desire to avoid burdening government highway construction projects with litigation and expenses related to copyright concerns.

For the reasons explained above, the Court concludes that the design for the CCSU garage is a building within the meaning of the Architectural Works Copyright Protection Act of 1990, and that Plaintiffs' copyright registration may not be invalidated on the theory advanced by Defendants. Accordingly, Defendants' Motion for Summary Judgment of Invalidity [doc. # 52] is DENIED.[3]

---

[3] The Court notes that Defendants did not challenge the validity of Plaintiffs' copyright on any other theory than that the CCSU parking garage is not a statutorily-protected building because it is not humanly habitable. In particular, Defendants did not suggest that registration of the CCSU parking garage design as an architectural work is at odds with the "useful article" doctrine of copyright law, although the interaction between that doctrine and the provision protecting architectural works has exercised academic commentators, *see, e.g.*, Gregory B. Hancks, Note, *Copyright Protection for Architectural Design: A Conceptual and Practical Criticism*, 71 Wash. L. Rev. 177 (1996); Todd Hixon, Note, *The Architectural Works Copyright Protection Act of 1990: At Odds with the Traditional Limitations of American Copyright Law*, 37 Ariz. L. Rev. 629 (Summer 1995). As recited above, Mr. Pilon's possession of a certificate of copyright registration is *prima facie* evidence of a valid copyright under 17 U.S.C. § 410(c), and Defendants bear the burden of rebutting that presumption of validity by presenting evidence that the CCSU parking garage is not copyrightable as a matter of law. Because Defendants have not invoked the useful article doctrine as grounds for invalidity, the Court need not, and does not, reach the questions of whether the useful article doctrine applies in the context of the architectural works provision of the Copyright Act and, if so, whether it would invalidate Mr. Pilon's copyright in the CCSU garage design. The Court holds only that the CCSU garage design is a building within the meaning of the Copyright Act and that Defendants have failed to carry their burden of rebutting the presumption that Mr. Pilon's copyright in that design is invalid.

B.    Ownership

This suit was brought by four Plaintiffs: Kenneth Pilon (the architect of the disputed design);

Pilon's firm – Moser Pilon; James Brockman (an engineer); and Brockman's firm – Macchi.  In their

Motion for Summary Judgment of Non-Ownership [doc. # 66], Defendants assert that Plaintiffs

Moser Pilon, James Brockman, and Macchi lack standing to pursue claims founded on alleged

copying of the design for the parking garage because the copyright in that design is owned solely by

Kenneth Pilon – Mr. Brockman's name having been stricken by Mr. Pilon  from the author field of

the application, and the corporate entities never having been listed on the application at all.

Although not named on the copyright registration, Plaintiffs Brockman, Macchi, and Moser

Pilon are entitled to joint ownership of the copyright if they can demonstrate: (1) the mutual intent

of the parties to be joint authors; and (2) that they made independently copyrightable contributions.

*Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991).  The requirement of an independently

copyrightable contribution requirement derives from the principle that ideas themselves may not be

copyrighted, so that "the author is the party who actually creates the work, that is, the person who

translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for*

*Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989); *see also Shaul v. Cherry*

*Valley-Springfield Cent. School Dist.*, 363 F.3d 177, 185 (2d Cir. 2004).  Accordingly, mere

collaboration is insufficient, and a putative joint author must show that he or she "independently

created" a contribution demonstrating "some minimal degree of creativity." *Mattel, Inc. v.*

*Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135 (2d Cir. 2004) (internal quotation marks omitted).

1.    *Joint Authorship*

As a preliminary matter, Plaintiffs' counsel conceded at oral argument that there was nothing

14

in the record to support the notion that either of the Plaintiff corporate entities – Moser Pilon and Macchi – could satisfy the requirement of having contributed independently copyrightable work distinct from the contributions of the individual Plaintiffs Kenneth Pilon and James Brockman. Thus, neither of these entities can claim authorship of the design for the parking garage.

The question remains whether Mr. Brockman made a contribution to the disputed design that would be independently copyrightable as an architectural work.[4]  In this regard, the Court must inquire not only whether he contributed original concepts to the design, but also whether he fixed them in a tangible medium of expression – in this case a building, architectural plans, or drawings. *See* 17 U.S.C. § 101 (defining an architectural work).  The Plaintiffs' submissions are not a model of clarity with respect to exactly who did what in the development of the CCSU garage design proposal but, drawing all inferences in Mr. Brockman's favor as the Court must on a motion for summary judgment, the Court concludes that there are material issues of fact regarding Mr. Brockman's alleged contributions that preclude summary judgment on this issue.

It is true that Plaintiffs describe the basic division of labor as engineering by Macchi and architecture by Pilon.  *See* Plaintiffs' Local Rule 56(a)(2) Statement Supplement [doc. # 83] at 2, ¶ 35; Affidavit of James Brockman [doc. # 81] ¶ 6.  It is also true that many of the determinations for which Mr. Brockman was responsibile – such as determining "[c]olumn spacing . . . [e]levation of the spandrels . . . [d]epth of spandrel . . . banding around masonry infill," Affidavit of James Brockman [doc. # 81] ¶ 7 – are ineligible for copyright protection because they were dictated by mechanical rather than creative considerations.  *See id.* ("[e]levation of the spandrels . . . is governed

---

[4]  The copyrightability of Mr. Brockman's contributions as something other than an architectural work – such as technical drawings –  is not at issue in this case because Plaintiffs have not claimed that they possess any copyright other than under the architectural work rubric.

by the required heights of the floors within the garage . . . [d]epth of spandrel . . . is governed by the span of the spandrel).  However, Mr. Brockman also claims responsibility for the "location and design of the glass curtain walls in the towers," Affidavit of James Brockman [doc. # 81] ¶ 3, and "[the] [i]nitial layout of the towers, as well as positioning the towers viz. the garage structure . . . [and] determining and locating the stairs and elevators within the towers." *Id.* ¶ 7.  Although Mr. Pilon's affidavit somewhat muddies the waters by asserting that Mr. Pilon "designed . . . layouts of each stair and stair elevator tower," and that all Plaintiffs "worked interactively . . . in establishing the spatial layouts, dimensions, and structural composition of the building," Supplemental Affidavit of Kenneth F. Pilon [doc. #  82] ¶ 2, a reasonable jury nonetheless could find that at least some of the "arrangement and composition of spaces and elements," 17 U.S.C. § 101, that makes up the architectural work was the fruit of Mr. Brockman's individual creative processes.

However, in order for Mr. Brockman to be considered an author of any "arrangement and composition of spaces and elements," within the meaning of the Copyright Act, the jury must also be able to find that Mr. Brockman "translate[d] [his] idea into a fixed, tangible expression entitled to copyright protection." *Reid*, 490 U.S. at 737 (1989).  In the context of architectural works, the protectable forms of expression are the building itself and any architectural plans and drawings.  The record reflects that Plaintiffs' copyright application contained not only color renderings of the final building design produced by Mr. Pilon, but also a variety of plans produced by James Brockman that speak to the arrangement and composition of spaces and elements within the stair-towers – something that is not at all apparent from the color renderings, which illustrate only the exterior of the proposed garage.  *See* Plaintiffs' Rule 56(a)(2) Statement [doc. # 71] ¶ 18-21; Plaintiffs' Ex. 23. Accordingly, the Court concludes that there are genuine and disputed issues of material fact

regarding whether Mr. Brockman made an independently copyrightable contribution to the design of the CCSU garage.

2.    *Mutual Intent*

As explained above, the Court agrees with Defendants that the claims of Plaintiffs Moser Pilon and Macchi Engineers fail because they did not make any independently copyrightable contributions.  Accordingly, the Court need not, and does not, address the mutual intent prong of joint authorship with respect to the claims of these two Plaintiffs.

With respect to the mutual intent of Mr. Pilon and Mr. Brockman to be joint authors, the Court finds that the sworn affidavits of these two Plaintiffs to the effect that they always intended joint ownership of the copyright, and the evidence that Mr. Brockman was originally listed as a joint author on the certificate of registration, at least raise genuine issues of material fact sufficient to preclude summary judgment on this prong of the *Childress* test for joint authorship.

For the foregoing reasons, the Court concludes that neither Macchi nor Moser Pilon may be considered joint authors of the disputed design, but that there are disputed issues of material fact regarding whether Mr. James Brockman satisfies the requirements for joint authorship. Accordingly, Defendants' Motion for Summary Judgment of Non-Ownership [doc. # 66] must be DENIED IN PART, that is, denied with respect to Mr. Brockman and granted with respect to the entities Moser Pilon and Macchi.

The Court having determined that neither Moser Pilon nor Macchi is an author of the disputed design, a further issue arises as to their standing to pursue the remaining claims in this case. Since neither is the author of the disputed design, it follows that neither has standing to pursue claims that seek redress for violations of an author's rights.  Since, as discussed below, the Lanham

Act, unjust enrichment and conversion claims, Counts II, III and IV of the Amended Complaint [doc. # 45], are predicated on the same acts of alleged copying, and contingent on a possessory interest in the thing copied, the non-author entities Moser Pilon and Macchi lack standing to pursue those claims and Defendants are entitled to summary judgment against Moser Pilon and Macchi on those claims. However, the CUTPA claim does not depend upon a claimant having a possessory interest in the allegedly copied design. Rather, the CUTPA claim asserts that by agreeing to copy the design proposal that comprised part of Plaintiffs' overall submission, Defendants gained an unfair trade advantage over Plaintiffs' entire bid team, not just over the author of the design. The entities Moser Pilon and Macchi therefore have standing to pursue the CUTPA claim.

C.      Preemption

        Defendants' Motion for Summary Judgment of Preemption argues that Plaintiffs' claim under the Copyright Act preempts all of their other claims. The Copyright Act is a plaintiff's exclusive recourse whenever: (1) the work upon which the non-copyright claim is based is protected by the Copyright Act; (2) the non-copyright claim involves acts that violate federal copyright law, i.e., "acts of reproduction, adaptation, performance, distribution, or display"; and (3) the non-copyright claim does not contain any "extra elements that make it qualitatively different from a copyright infringement claim." *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F. 3d 296, 305 (2d Cir. 2004). Applying this test, the Court concludes that Plaintiffs' federal claim under the Lanham Act and state law claims of conversion and unjust enrichment are preempted by the Copyright Act, but Plaintiffs' CUTPA claim is not preempted.

        1.      *Lanham Act*

        In Count II of the Amended Complaint, Plaintiffs assert a claim for false designation of origin

18

and misleading description of fact under the Lanham Act, 15 U.S.C. § 1125(a)(1), which makes actionable false or misleading representations that are likely to cause confusion or deception as to the origin of goods or services. According to Plaintiffs, Defendants held out Plaintiffs' design for the CCSU garage as their own, and thereby caused confusion in the public and potential clients as to the origin of the design services actually provided by Plaintiffs. For the reasons explained below, the Court concludes that no reasonable juror could find for Plaintiffs on their the Lanham Act claim against either Defendant.

Plaintiffs' claim of false designation of origin turns on "the ongoing publication on HNTB's website . . . of plaintiffs' design as representing a design produced by the defendants for the CCSU parking garage project." Memorandum in Opposition to Motion for Summary Judgment of Preemption [doc. # 70] at 8; *see also* Plaintiffs' Rule 56(a)(2) Statement [doc. # 71] at 14, ¶ 20. As a preliminary matter, the Court notes that this allegation in no way involves wrongful behavior by Defendant Downes. Accordingly, Downes is entitled to summary judgment on Plaintiffs' Lanham Act claim.

With respect to Defendant HNTB, Plaintiffs' claim turns on HNTB's alleged publication on its website of a copy of Plaintiffs' design. Plaintiffs do not claim that HNTB tried to pass off Plaintiffs' physical renderings as its own.[5] The problem for Plaintiffs is that in *Dastar Corp. v.*

---

[5] Plaintiffs did plead one example of false designation of origin involving the "actual renderings," alleging that those renderings were published "within the CCSU and CSU community, as well as to the public at large, in December 2001-January 2002 as representing the "winning" design that defendants had been selected to build." Memorandum in Opposition to Motion for Summary Judgment of Preemption [doc. # 70] at 8; *see also* Plaintiffs' Rule 56(a)(2) Statement [doc. # 71] at 8, ¶ 10. However, it is undisputed that the party responsible for this instance of misrepresentation was the CCSU Facilities Manager, who is not named as defendant in this suit. *See id.* (explicitly attributing the unauthorized publication to "Mr. Moran, the CCSU facilities manager"). Thus, this allegation does nothing to advance Plaintiffs' Lanham Act claim against Defendants.

*Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), the Supreme Court held that copying of creative content like that alleged in this case is not protected by the "origin of work" provision of the Lanham Act, which covers only "the producer of the tangible goods that are offered for sale, and not . . . the author of any idea, concept, or communication embodied in those goods." *Id.* at 37. Although the Supreme Court recognized that consumers of communicative products, such as books and films might be concerned about the identity of the author of those works, it held that claims about the misdesignation of the authorship of such works did not fall within the purview of the Lanham Act – precisely because this sort of claim falls within the purview of copyright law. *Id.* at 33-35; *see also Radolf v. University of Connecticut*, 364 F. Supp. 2d 204, 222 (D. Conn. 2005) ("Because [Plaintiff]'s claim centers around his contention that he was the 'author' or originator of the ideas and concepts that underlie the [disputed work], his Lanham Act claim necessarily fails in light of *Dastar*."). It appears to the Court that *Dastar* applies with equal force to architectural works and that Plaintiffs' claim under the Lanham Act therefore fails.

Plaintiffs assert that parallel claims under the Lanham Act and Copyright Act by architects have been upheld by the Sixth Circuit and that *Dastar* should not be read as overruling the Sixth Circuit on this point. But *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998), upon which Plaintiffs rely, is simply inapposite: Defendant architect in *Johnson* not only held out as his own copies of some the predecessor architect's plans, but physically "took the [original] drawings and site plan that he had obtained from the city inspector, removed [plaintiff architect's] name and seal, and replaced them with his own name and seal." *Id.* at 499. No such physical misappropriation is alleged against Defendants in this case. Accordingly, the Court concludes that Plaintiffs' reliance on *Johnson* is misplaced, and Plaintiffs' claim under the Lanham Act is preempted by the Copyright Act in

accordance with *Dastar*.

2.      *Unjust Enrichment*

In Count III of the Amended Complaint, Plaintiffs claim that Defendants were unjustly enriched by wrongfully appropriating Plaintiffs' design.  Defendants counter that Plaintiffs' unjust enrichment claim is identical to, and therefore preempted by, Plaintiffs' copyright claim.  The Court agrees.

Plaintiffs imply that their unjust enrichment claim is not preempted by the Copyright Act because it contains the "extra elements" of enrichment and misappropriation.  However, Plaintiffs' unjust enrichment claim is based on Defendants' alleged wrongful copying of their copyright-protected expression, and in such cases the Second Circuit has held that neither misappropriation nor enrichment, without more, is sufficient to avert preemption.  *See Briarpatch*, 373 F.3d at 306 ("While enrichment is not required for copyright infringement, we do not believe that it goes far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim."); *Computer Associates International, Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992) ("[M]isappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted.").

Plaintiffs further argue that, even if their unjust enrichment claim would be preempted by a valid copyright claim, they are entitled to plead it "in the alternative," in case Defendants prevail on the copyright claim.  But Plaintiffs' argument proves too much: on Plaintiffs' theory of pleading in the alternative, no court could ever decide a motion to dismiss a claim on the basis of preemption until the merits of the copyright claim had first been decided.  Yet courts routinely grant motions to dismiss state law claims on the basis of preemption by the Copyright Act.  *See, e.g.*, *Irwin v. ZDF*

21

*Enterprises GmbH*, No. 04 CIV. 8027(RWS), 2006 WL 374960 at *5-6 (S.D.N.Y. Feb. 16, 2006);

*A Slice of Pie*, 392 F. Supp. 2d at 314-316.  The relevant question is whether Plaintiffs *could* bring

their claims under the copyright law at all, not whether they will, nor even whether they will

ultimately prevail on their copyright claim.  The *Ulloa* case cited by Plaintiffs is not to the contrary

because, in the very passage that Plaintiffs quote, the district court expressly acknowledged that

"Plaintiff is not entitled to bring an unjust enrichment claim that is identical to her copyright

infringement claim." *Ulloa v. Universal Music and Video Distribution Corp.*, No. 01-Civ-9583(BSJ),

2004 WL 840279 at * 3 (S.D.N.Y. Apr. 19, 2004).  As discussed above, Plaintiffs' claim in this case

contains no extra elements that qualitatively distinguish it from a copyright claim, and *Ulloa* is

therefore inapposite.  The Court concludes that Plaintiffs' unjust enrichment claim is preempted by

the Copyright Act.

      3.    *Conversion*

Count IV of the Amended Complaint is a state law claim for conversion of Plaintiffs' design.

Plaintiffs do not allege that Defendants took possession of the original renderings, but rather that

Defendants copied Plaintiffs' work.  Accordingly, the "conversion claim [is] preempted by the

Copyright Act since it is based solely on copying, i.e., wrongful use, not wrongful possession." *A

Slice of Pie*, 392 F. Supp. 2d at 317.

As with respect to their unjust enrichment claim, Plaintiffs argue that, even if their

conversion claim may be preempted by a valid copyright claim, the conversion claim should survive

dismissal as a claim in the alternative until the copyright claim is adjudicated.  This argument fails

for the reasons stated above in Subsection 2.  Accordingly, the Court concludes that Plaintiffs'

conversion claim is preempted by the Copyright Act.

4.    *CUTPA*

Count Five of the Amended Complaint alleges that Defendants violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b (a).  According to Plaintiffs, Defendants engaged in unfair competition by agreeing to abandon their proposed design and copy Plaintiffs' design in exchange for CCSU's agreement to execute the contract.  Defendants argue that Plaintiffs' CUTPA claim is "grounded solely in the copying of a plaintiff's protected expression" and therefore preempted by the Copyright Act.  *See Kregos v. Assoc. Press*, 3 F.2d 656, 666 (2d Cir. 1993).  Plaintiffs counter that their CUTPA claim involves an extra element that qualitatively distinguishes it from a copyright claim – namely, that Defendants undermined the public bidding process for the contract by agreeing to copy Plaintiffs' design in return for being awarded the contract.  The Court agrees and concludes that Plaintiffs' CUTPA claim is not preempted by the Copyright Act.

As a preliminary matter, the Court notes that, although the record clearly reflects that an agreement to copy Plaintiffs' design occurred before the *execution* of the contract between Defendants and CCSU in May 2002, Plaintiffs' subversion of the public bidding process argument requires them to demonstrate that the agreement to copy occurred before the *award* of the contract in November 2001.  This is so because it is the award of the contract, not its execution, that was the result of the public bidding process.  Although the majority of evidence involves discussions between Defendants and CCSU that occurred after Defendants had already won the competition, drawing all inferences in Plaintiffs' favor, the Court concludes that a reasonable jury could find that the agreement occurred prior to the initial award.  The record reflects: (1) that individuals associated with Downes were personally acquainted with members of the selection panel, *see* Russo Dep. [doc.

23

# 74.6] at 30-36; and (2) that Downes was informally warned the day before selection that its bid price was ranked second and that it should "get rid of the architect," because its design submission was "not good," Plaintiffs' Ex. 1 [doc. # 74.2].  More damagingly, Plaintiffs have produced a fax from Downes to HNTB in which HNTB asserts that "[p]rior to the award of the project to DCC/HNTB [we] agreed that we would modify the design per CCSU's request.  That was one of the things that got us the job."  Plaintiffs' Ex. 14 [doc. # 74.15].  Through these exhibits, Plaintiffs have raised questions of fact with respect to the material issue of whether the selection panel based its decision on anything other than the superior price, schedule, and compliance with the "program for design" of Defendants' proposal.

The question remains whether Plaintiffs' theory of subversion of the public bidding process is sufficient to save the CUTPA claim from preemption.  The Court concludes that it is.  While the Copyright Act offers protection against the alleged copying of Plaintiffs' design, it offers no redress for the alleged subversion of the important state interest in adherence to the mandated procedures for awarding state contracts through publicly-bid competitions.  Because Plaintiffs' CUTPA claim seeks redress for misconduct that falls outside the scope of copyright protection, it satisfies the "extra element" test.  *Cf. Kregos*, 3 F.3d at 666 ("[U]nfair-competition claims based upon breaches of confidential relationships, breaches of fiduciary duties and trade secrets have been held to satisfy the extra-element test.").  Allowing this kind of CUTPA claim does not allow the state to "encroach on federal [copyright] laws . . . [by] giv[ing] protection of a kind that clashes with [their] objectives," *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964), and preemption therefore does not apply.

24

**IV.**

For the foregoing reasons, Defendants' Motion for Summary Judgment of Invalidity [doc. # 52] is DENIED, Defendants' Motion for Summary Judgment of Non-Ownership [doc. # 66] is GRANTED IN PART and DENIED IN PART, and Defendants' Motion for Summary Judgment of Preemption [doc. # 50] is GRANTED IN PART and DENIED IN PART.

Judgment shall enter for Defendants on Counts II, III, and IV as against all Plaintiffs. Judgment shall enter for Defendants on Count I as against Plaintiffs Moser Pilon Nelson Architects and Macchi Engineers only.

The following two claims remain in this case: (1) The claims of Mr. Pilon and Mr. Brockman against both Defendants under the Copyright Act; and (2) the claims of all Plaintiffs against both Defendants under CUTPA.

IT IS SO ORDERED.

/s/       Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: <u>August 7, 2006</u>.**

25